**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Criminal Case No. 18-cr-00267-REB-JMC

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. MERLE DENEZPI,

    Defendant.

**ORDER DENYING MOTION TO DISMISS ON DOUBLE JEOPARDY GROUNDS**

**Blackburn, J.**

The matter before me is defendant Merle Denezpi's **Motion To Dismiss on Double Jeopardy Grounds**[#29],[1] filed January 6, 2019. Mr. Denezpi maintains indictment in this case is duplicative of his prior conviction by the Court of Indian Offenses of the Ute Mountain Ute Agency and thus constitutes double jeopardy. The government filed a response (*see* [#30], filed January 15, 2019). Having considered the motion and response, and being apprised of the parties' arguments and the relevant authorities, I deny the motion.

On July 17, 2017, Mr. Denezpi and V.Y. traveled from Teec Nos Pos, Arizona,[2] to Mr. Denezpi's girlfriend's home in Towaoc, Colorado. Once inside the house, Mr. Denezpi allegedly barricaded the door and, by physical force and threats, forced V.Y. to

---

    [1] "[#29]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF). I use this convention throughout this order and other orders entered in this case.

    [2] Although the crime occurred within the tribal lands of the Ute Mountain Ute Tribe, Mr. Denezpi and V.Y. are both members of the Navajo Tribe. Congress has recognized explicitly the Indian tribes' "'powers of self-government' to include 'the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians,' including nonmembers." ***United States v. Lara***, 541 U.S. 193, 1998, 124 S.Ct. 1628, 1632, 158 L.Ed.2d 420 (2004) (quoting 25 U.S.C. § 1301(2)).

engage in a nonconsensual sexual act. Tribal authorities arrested Mr. Denezpi the following day and charged him with one count of assault and battery in violation of Title 6, Ute Mountain Ute Code, Section 2; one count of making terroristic threats in violation of 25 C.F.R. § 11.402; and one count of false imprisonment in violation of 25 C.F.R. § 11.404.[3] On December 6, 2017, Mr. Denezpi entered an *Alford* plea[4] to the assault and battery count[5] and was sentenced to time served.

Six months later, a federal grand jury indicted Mr. Denezpi on one count of aggravated sexual abuse in Indian Country. **See** 18 U.S.C. §§ 2241(a)(1)-(2) & 1153(a). Mr. Denezpi claims this prosecution violates the Fifth Amendment proscription against double jeopardy because it was imposed not by a tribal court but by a so-called "CFR court," which, Mr. Denezpi argues, is an arm of the federal government and not a separate sovereign. Because this argument misunderstands the source and nature of the CFR courts' authority, I reject it.

The Double Jeopardy Clause of the Fifth Amendment provides that no person "shall . . . be subject for the same offence to be twice put in jeopardy of life or limb." **U.S. CONST**., Amend. 5. This motion implicates the dual sovereignty doctrine, an exception to the general principle of double jeopardy, whereby "a single act gives rise to

---

[3] These two provisions of the Code of Federal Regulations define criminal offenses enforceable in the Courts of Indian Offenses.

[4] So called based on the holding of **North Carolina v. Alford**, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), in which the Supreme Court sanctioned pleas by which "[a]n individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime" because he "intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt." *Id*. 91 S.Ct. at 167.

[5] The remaining two counts were dismissed with prejudice.

distinct offenses – and thus may subject a person to successive prosecutions – if it violates the laws of separate sovereigns." **Puerto Rico v. Sanchez Valle**, – U.S. –, 136 S.Ct. 1863, 1867, 195 L.Ed.2d 179 (2016). **See also Heath v. Alabama**, 474 U.S. 82, 88, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985) ("[W]hen the same act transgresses the laws of two sovereigns, it cannot be truly averred that the offender has been twice punished for the same offence; but only that by one act he has committed two offences.") (internal quotation marks omitted). The determination whether two entities are separate sovereigns "does not turn, as the term 'sovereignty' sometimes suggests, on the degree to which the second entity is autonomous from the first or sets its own political course." **Sanchez Valle**, 136 S.Ct. at 1867. Instead, the determination lies in the answer to "a narrow, historically focused question. . . . whether the prosecutorial powers of the two jurisdictions have independent origins – or, said conversely, whether those powers derive from the same 'ultimate source.'" **Id.** (citing **United States v. Wheeler**, 435 U.S. 313, 320, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978)). "The inquiry is thus historical, not functional – looking at the deepest wellsprings, not the current exercise, of prosecutorial authority." **Id.** at 1871.

Accordingly, I turn to history. In the time before the United States became a nation, "the tribes were self-governing sovereign political communities, possessing (among other capacities) the inherent power to prescribe laws for their members and to punish infractions of those laws." **Wheeler**, 98 S.Ct. at 1872 (internal citations and quotation marks omitted). After the United States was formed and acquired tribal lands, the tribes became "domestic dependent nations," **id.**; **see also Cherokee Nation v.**

3

***State of Georgia***, 30 U.S. 1, 17, 8 L Ed. 25 (1831) (Marshall, C.J.), and Congress assumed "plenary authority to limit, modify or eliminate the [tribes'] powers of local self-government," ***Santa Clara Pueblo v. Martinez***, 436 U.S. 49, 56, 98 S.Ct. 1670, 1676, 56 L.Ed.2d 106 (1978). Thus, "in the exercise of the powers of self-government, as in all other matters, the . . . tribes[ remain] subject to ultimate federal control." ***Wheeler***, 98 S.Ct. at 1088.

The CFR courts were created by the Indian Department Appropriations Act of 1888. ***See Oliphant v. Suquamish Indian Tribe***, 435 U.S. 191, n. 7, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). At first, all tribal courts were CFR courts. In keeping with the federal government's then extant policy of assimilation on the Indian tribes, the Secretary of the Interior, through the Bureau of Indian Affairs ("BIA"), "exerted a heavy influence on these courts" through the promulgation of regulatory codes and the appointment of Indian judges who were responsible to the BIA. ***See*** Vincent C. Milani, *The Right to Counsel in Native American Indian Tribal Courts; Tribal Sovereignty & Congressional Control*, 31 Am. Crim. L. Rev. 1279, 1281 (1994).

However, the passage of the Indian Reorganization Act of 1934 ("IRA") "signaled a major shift in federal Indian policy from assimilation to self-determination. Along with a reduced BIA role and increased authority delegated to the tribes, the IRA paved the way for tribes to develop tribal courts and phase out the C.F.R. courts." ***Id.*** Today, most tribes have established tribal courts. ***See*** 25 C.F.R. § 11.104 (setting forth criteria for creation of tribal court). Only seven CFR courts – including those administered by the Ute Mountain Ute Agency – remain in operation. ***See*** Tribal Law and Policy

Institute, Tribal Court Clearinghouse, *Tribal Courts* (available at: https://www.tribal-institute.org/lists/justice.htm#CFR Courts) (last accessed January 18, 2019). Although not tribal courts, CFR courts still "function as tribal courts; they constitute the judicial forum through which the tribe can exercise its jurisdiction until such time as the tribe adopts a formal law and order code." **Tillett v. Lujan**, 931 F.2d 636, 638 (10th Cir. 1991) (citing 25 C.F.R. §§ 11.1(d) & (e)).

With that background, I turn to the matter before me. Long-standing Supreme Court precedent makes clear that while Congress may limit or prescribe the way in which tribal courts may operate, the right to punish crimes occurring on tribal lands derives from the tribes' "primeval sovereignty" which "has never been taken away from them, either explicitly or implicitly, and is attributable in no way to any delegation to them of federal authority." **Wheeler**, 98 S.Ct. at 1088-89. The **Wheeler** decision, however, examined the authority of a tribal court. The Court specifically noted that it had no occasion to determine the precise issue presented here – whether CFR courts derive their authority to punish crimes committed on their lands from the inherent sovereignty of the tribe or, alternatively, whether that authority comes only via the auspices of the federal government through the Code of Federal Regulations. *See id.* at 1088 n.26.

Although the CFR courts "retain some characteristics of an agency of the federal government," **Tillett**, 931 F.2d at 640, the logic of **Wheeler** and its progeny clearly indicates that the CFR courts' power to punish crimes occurring on tribal lands derives from their original sovereignty, not from a grant of authority by the federal government.

5

When Indian courts were first established in the 19th century, *all* such courts were CFR courts. The development of tribal courts came about more than 50 years later. Yet the ***Wheeler*** Court did not say that the tribal courts' powers to punish crimes within their jurisdictions were *returned* to them by the Secretary of Interior once the tribal court was created and the prior CFR court thereby extinguished.[6] Instead, the Court recognized that such powers were part of the tribes' original sovereignty, which had never been extinguished, despite the exercise of congressional "defeasance" as to other aspects of tribal authority. ***Wheeler***, 98 S.Ct. at 1088-89. ***See also Sanchez Valle***, 136 S.Ct. at 1872 ("But unless and until Congress withdraws a tribal power – including the power to prosecute – the Indian community retains that authority in its earliest form. . . . A tribal prosecution, like a State's, is attributable in no way to any delegation . . . of federal authority.") (citation and internal quotation marks omitted).

The law regulating Indian courts further supports this conclusion. The Indian Civil Rights Act, 25 U.S.C. §§ 1301 - 1341, "recognize[s] and affirm[s]" the "inherent power of Indian tribes . . . to exercise jurisdiction over all Indians." 25 U.S.C. § 1301(2). Although enacted in response to decisions limiting the tribes' authority to prosecute non-member Indians, ***see United States v. Lara***, 541 U.S. 193, 199, 124 S.Ct. 1628, 1632-33, 158 L.Ed.2d 420 (2004), that statement of legislative intent is not explicitly limited to tribal courts. The comments made in connection with the adoption of the legislation incorporating this language add ballast to the notion that Congress perceives the tribes'

---

[6] Indeed, the tribal courts themselves are subject to various limitations and requirements imposed by federal statute, none of which "created the Indians' power to govern themselves and their right to punish crimes committed by tribal offenders." ***Wheeler***, 98 S.Ct. at 1088.

6

criminal jurisdiction over their own lands to be part of their inherent sovereign authority.

*See id.*

Finally, the Courts of Indian Appeals long have recognized that CFR courts exercise the inherent powers retained by the tribes as part of their original sovereignty. As the Court of Indian Appeals for the Kiowa Tribe stated more than 30 years ago:

> [T]oday [CFR] courts no longer can be categorized as [mere administrative creations of the Interior Department], and in fact have been acknowledged to operate under the residual sovereignty of the tribes as well as under the authority of the federal government.

*Kiowa Election Board v. Lujan*, 1987 WL 382994 at *4 (Kiowa CIA Nov. 19, 1987) (footnote omitted). Other Courts of Indian Appeals also have reached this conclusion, *see Gallegos v. French*, 1991 WL 733411 at *10 (Delaware CIA June 4, 1991); *Ponca Tribal Election Board v. Snake*, 1988 WL 521355 at *5 (Ponca CIA Nov. 10, 1988) (citing cases), as has at least one United States District Court, *see Comanche Tribe v. Welter*, CIV-84-765-A (W.D. Okla. Sept. 4, 1986) ("The CFR Court does not represent a donation of jurisdiction by the United States to the Comanche Tribe; rather it was established by the United States as a channeling function simply to set up a tribunal, the existence and procedure of which would thereby be made public, so that a tribe could exert through it the powers it always had.") (quoted in *Kiowa Election Board*, 1987 WL 382994 at *4 & n.10).

I therefore find and conclude that the CFR court which convicted Mr. Denezpi was exercising the sovereign powers of the Ute Mountain Ute Tribe and is not an arm of the federal government. The charges brought in the present federal indictment thus are

7

not duplicative of Mr. Denezpi's conviction in that independent and sovereign court, and therefore his prosecution in this jurisdiction does not violate the Fifth Amendment's Double Jeopardy Clause. Mr. Denezpi's motion to dismiss therefore must be denied.

**THEREFORE, IT IS ORDERED** that defendant Merle Denezpi's **Motion To Dismiss on Double Jeopardy Grounds**[#29], filed January 6, 2019, is denied.

Dated January 23, 2019, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge